UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | CRIMINAL ACTION NO. |
| | ) | 14-10051-DPW |
| v. | ) | |
| | ) | |
| HECTOR ANTONIO CRUZ-MERCEDES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM</u>
May 15, 2019

The Defendant, Hector Antonio Cruz-Mercedes, was charged in a multi-count indictment alleging a conspiracy to obtain income tax refunds fraudulently from the United States Treasury by filing materially false income tax forms.

Mr. Cruz-Mercedes moved [Dkt. No. 57] to suppress evidence seized by the Government as a result of what he contends was an unlawful arrest on June 7, 2012.  He also moved [Dkt. No. 60] in what I will term his *Daubert* motion — in recognition that it sought my gate keeper determination regarding expert evidence under the protocols established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578 (1993) — to exclude the Government's expert testimony relating to identification of fingerprints found on fraudulent Treasury checks seized during an automobile search as a result of his allegedly unlawful June 7, 2012 arrest.

After I denied his motion to suppress in part and declined
in ruling on the *Daubert* motion to exclude the Government's
expert fingerprint testimony, Mr. Cruz-Mercedes entered — with
the consent of the Government and the court — a conditional plea
of guilty pursuant to FED. R. CRIM. P. 11(a)(2).[1]

---

[1] In his "Motion to Enter Conditional Plea of Guilty (Assented
To)" [Dkt. No 96], Mr. Cruz-Mercedes identified the issue for
appeal as follows: "Specifically, Defendant requests that he be
permitted to reserve for appellate review the court's adverse
determination on his motion to suppress fingerprint evidence."
This identification of the issues is somewhat ambiguous but
fairly and generously read, appears to implicate adverse
determinations of certain aspects of two pretrial motions filed
by the Defendant to the extent that the evidence said to be the
fruits of an allegedly improper automobile search yielded checks
that the government would contend were handled by him.  Under
FED. R. CRIM. P. 11 (a)(2), the Defendant's appeal is thus limited
to the government's anticipated fingerprint evidence.  *See,
e.g.*, *United States* v. *Ramos*, 961 F.2d 1003, 1005-06 (1st Cir.
1992) (holding that "[a] defendant is normally deemed to waive
arguments that he does not present to the district court. . . .
This is particularly so where, having pled guilty, he
conditionally preserves for appellate review only the district
court's adverse rulings on specified pretrial motions." (citing,
among others, *United States* v. *Simmons*, 763 F.2d 529, 533 (2d
Cir. 1985) ("[T]he entry of a conditional guilty plea preserves
only the specifically mentioned issues and waives all other
nonjurisdictional claims."))); *United States* v. *Encarnacion-
Ruis*, 787 F.3d 581, 585 (1st Cir. 2015) (upholding a conditional
plea that outlined a specific legal question, rather than a
specific motion, that the defendant sought to appeal and
allowing an appeal on that question to move forward.).
    Here, Mr. Cruz-Mercedes made clear in both his motion for a
conditional plea and during the plea colloquy, that he intends
to appeal only the portions of the present motion to suppress
and *Daubert* motion related to the admissibility of fingerprint
evidence.  The Government has confirmed this understanding, and,
consequently, I accepted the conditional plea.  *See Gould* v.
*United States*, 657 F. Supp. 2d 321, 327 n. 7 (D. Mass. 2009)
(citing to various circuit court decisions which interpret FED.
R. CRIM. P. 11(a)(2) strictly to ensure that there is a precise

As I promised the parties, I provide in this Memorandum a full written explanation for my brief *ore tenus* rulings granting in part and denying in part the motion to suppress [Dkt. No. 57] and denying the motion to exclude the government's expert testimony regarding fingerprints [Dkt. No. 60].

## I. BACKGROUND

**A.   *Factual Background*.**

### 1.   The Original Investigation

In March 2012, the Department of Homeland Security's Investigation unit ("HSI") in Boston received information from a confidential informant ("CI") that individuals in New York were filing false tax returns using Social Security numbers stolen from Puerto Rican residents.  The CI informed HSI agents that the people involved in the operation were looking for ways to cash fraudulently-obtained refund checks and, at the direction of HSI and the United States Secret Service, arranged to meet with these individuals to assist in cashing the checks.

---

record of the government's consent to the reservation of specific issues for appeal).

To provide a full context for understanding the defendant's appellate contentions, however, I discuss my disposition of Defendant's suppression initiatives more broadly in this Memorandum.  Although I disposed of both motions in oral rulings from the bench, I take this occasion — before the filing of Defendant-Appellant's brief in the First Circuit — after detailed review of the relevant transcripts (certain of which were not completed and docketed until after Notice of Appeal was filed) to explain more fully the reasoning underlying my disposition of these motions.

Between April and May 2012, the CI met with Odalis Castillo-Lopez in South Attleboro, Massachusetts on several occasions to pick up the fraudulently-obtained checks.  On two such occasions, the checks were wrapped in a sheet of paper listing the names and Social Security Numbers of the individuals to whom the checks were issued.

Through a series of recorded telephone calls, the CI arranged to meet Mr. Castillo-Lopez a fourth time on June 7, 2012 to pick up approximately $160,000 in checks in exchange for a payment of $80,000.  Agents from HSI and the Secret Service planned to arrest Mr. Castillo-Lopez at that meeting.  In anticipation of doing so, they established surveillance at the meeting location, a parking lot next to a McDonald's in South Attleboro.

### 2.   The Arrest

On June 7, 2012, Mr. Castillo-Lopez and another individual, later identified as the Defendant, arrived at the location in a white Volkswagen Passat with New York license plates ("the vehicle") just after noon.  Mr. Castillo-Lopez was driving; the vehicle was later identified as being owned by a person named Alma Martinez.  Agents observed both men exit the car and enter the McDonald's.  Special Agents John Soares and Michael Riley of HSI and Special Agent Fred Mitchell of the Secret Service then entered the McDonald's.  Agents Soares and Mitchell approached

Mr. Castillo-Lopez,[2] asked him some questions, and escorted him out of the McDonald's.  Mr. Castillo-Lopez was then arrested and taken to the Boston Field Office of HSI for processing.

Agent Riley approached Mr. Cruz-Mercedes in the McDonald's and had a brief conversation with him.  There is no evidence of record about the content of that conversation, and there is some dispute about what happened next.  Both Agent Soares and Agent Mitchell testified that Mr. Cruz-Mercedes was escorted out of the McDonald's by Agent Riley, and that he was eventually questioned outside, near the vehicle, by Special Agent Kevin Cronin of HSI.  Agent Soares testified that Agent Riley did not handcuff Mr. Cruz-Mercedes, and that he was not handcuffed until he was subsequently arrested by Agent Cronin.  However, Agent Mitchell testified that Mr. Cruz-Mercedes was handcuffed inside the McDonald's, before being escorted out and Agent Cronin

---

[2] There is some dispute about where Mr. Castillo-Lopez was when this interaction took place.  Agent Soares testified that Mr. Castillo-Lopez was standing in line, while Mr. Cruz-Mercedes was "standing near the windows."  In contrast, Agent Mitchell testified that Mr. Castillo-Lopez was standing in a booth by one of the windows, next to Mr. Cruz-Mercedes, when the men were approached by the agents.  There is also some dispute about when Mr. Castillo-Lopez was handcuffed.  Agent Soares testified that Mr. Castillo-Lopez was handcuffed and placed under arrest after leaving the McDonald's, while Agent Mitchell testified that he "put handcuffs on [Mr. Castillo-Lopez]" inside the McDonalds, before escorting him and Mr. Cruz-Mercedes out of the building. I am satisfied that, regardless of whether the handcuffs were placed on Mr. Castillo-Lopez before being escorted out of the McDonald's or after, as with Mr. Cruz-Mercedes, Mr. Castillo-Lopez was in custody when he was escorted from the building.

testified that Mr. Cruz-Mercedes had been placed in custody

before being brought out to the parking lot to talk to him.  I

am satisfied that, by the time he was brought to the parking

lot, Mr. Cruz-Mercedes had been taken into custody, irrespective

of whether the initial encounter inside the McDonald's could be

characterized as a "Terry" investigative stop.[3]

Once he was brought out to the parking lot, Mr. Cruz-

Mercedes had a brief conversation with Agent Cronin, during

which he initially identified himself as "Pedro Colon" and

handed over several identification documents, including a

Massachusetts driver's license and a Social Security card

---

[3] The Fourth Amendment protects individuals against all
unreasonable "seizures of the person," including those which "do
not eventuate in a trip to the stationhouse and prosecution for
crime." *Terry* v. *Ohio*, 392 U.S. 1, 16 (1968).  Despite this
broad understanding of the term "seizure," the Supreme Court has
declined to extend the full constitutional protections –
including the probable cause requirement - afforded to an
individual who is placed under arrest to all individuals who are
"seized" by law enforcement during the investigative process.
Instead, it has permitted law enforcement officers to "stop and
briefly detain an individual for investigative purposes if
police have a reasonable suspicion that criminal activity is
underfoot." *United States* v. *Dapolito*, 713 F.3d 141, 147-48
(1st Cir. 2013).  When characterizing interactions between law
enforcement and individuals, then, these so-called "Terry" stops
form an intermediate category: they qualify as a seizure under
the Fourth Amendment and require at least reasonable suspicion
that a particular individual is engaged in wrongdoing.  But they
are shorter in duration and more limited in scope than an arrest
and require something less than probable cause.  Nevertheless,
they can, with time, mature into a full arrest and trigger the
constitutional protections associated with a full arrest.  *See
infra* Section II.B.1, n. 8.

listing his name as Pedro Colon.  Agent Cronin, indicating that
he did not believe the Defendant was telling the truth about his
identity, pressed Mr. Cruz-Mercedes further, asking him if the
documents were, in fact, his.  In response to this further
investigative inquiry, the Defendant told Agent Cronin that his
name was, in fact, Hector Cruz-Mercedes, and that he was a
native of the Dominican Republic who had entered the United
States unlawfully.  Agent Cronin then formally arrested Mr.
Cruz-Mercedes for being in the United States unlawfully and
conducted a search of the Defendant incident to arrest; that
search uncovered two cell phones.  The Defendant was transported
to the HSI office for processing, at which point he was
fingerprinted.  At no point during his encounter with law
enforcement after being escorted out of the McDonald's was Mr.
Cruz-Mercedes advised of his *Miranda* rights.

> 3.   The Search of the Vehicle

After both Mr. Cruz-Mercedes and Mr. Castillo-Lopez were
taken away from the parking lot, other agents conducted a
cursory search of the vehicle and concluded that the parking lot
was not a secure location.  The vehicle was impounded and
brought to the Government Center Garage in Boston's O'Neill
Federal Building.  There, the vehicle was searched more
thoroughly by Agents Soares and Mitchell, who were looking
specifically for the additional Treasury checks that the CI had

arranged to pick up from Mr. Castillo-Lopez.  The search uncovered an envelope tucked into the headliner above the driver's seat.  The envelope contained ten Treasury checks and, as with two of the earlier check deliveries, a list of names, dates of birth, and Social Security numbers corresponding to the payees of the checks.

The search also uncovered a bank deposit slip from an account at Bank of America and a personal check made out to Saw Mills Auto Sales.  The name on the check was "Anna Cruz," and the check included her associated address.  Further investigation indicated that this check was associated with the Bank of America account listed on the deposit slip found in the vehicle.  This was one of the bank accounts that Mr. Castillo-Lopez had instructed the CI to use to deposit proceeds from the cashing of the Treasury checks.

At some point during the investigation, evidence found in the vehicle was sent to Sergeant John Costa, of the Massachusetts State Police ("MSP"), to be tested for fingerprints.  Sgt. Costa recovered eight prints, but only one was clear enough to form the basis of an identification.  Sgt. Costa subsequently matched the latent print to a known print taken from Mr. Cruz-Mercedes when he was processed by HSI after his June 7, 2012 arrest.

**B.    *Procedural Background***

On June 7, 2012, a Criminal Complaint was issued against Mr. Castillo-Lopez for Conversion of Government Property and Money Laundering, in violation of 18 U.S.C. § 641 and § 1956 respectively.

On August 9, 2012, a Criminal Complaint was issued against Mr. Cruz-Mercedes for the Deceptive Use of a Social Security Number, in violation of 42 U.S.C. § 408(a)(7)(B).  That Complaint was based on the fact that Mr. Cruz-Mercedes initially identified himself to Agent Cronin as Pedro Colon and produced several identification documents, including a Social Security Card, with the name Pedro Colon.

Mr. Cruz-Mercedes was arrested on August 16, 2012[4] in Bronx County, New York and appeared that same day before Magistrate Judge Peck in the Southern District of New York.  Judge Peck released Mr. Cruz-Mercedes on a $10,000 bond and ordered him to appear in this Court on or before August 24, 2012.

Mr. Cruz-Mercedes then fled the country and returned to his native Dominican Republic.  Once Mr. Cruz-Mercedes had been located, the Government arranged to extradite him and he made

---

[4] The record is not clear when or why Mr. Cruz-Mercedes was released from Administrative Detention following his arrest by Agent Cronin on June 7, 2012 for being in the country illegally. However, when the original complaint against him was filed, Mr. Cruz-Mercedes was not in federal custody.

his initial appearance in this Court before Magistrate Judge Cabell on December 1, 2017.[5]

In anticipation of trial, Mr. Cruz-Mercedes filed his motion to suppress all evidence seized in connection with his June 7, 2012 arrest, including Treasury checks taken from the vehicle. He argued that his arrest was unlawful because it was unsupported by probable cause and that the complained-of evidence constituted the fruits of an unlawful seizure required to be suppressed under the teachings of *Wong Sun* v. *United States*, 371 U.S. 471 (1963). Mr. Cruz-Mercedes separately filed his *Daubert* motion to exclude the testimony of the Government's fingerprint expert regarding the process of matching his known fingerprints to the fingerprint discovered on the Treasury checks. The government's expert had filed a report opining that Mr. Cruz- Mercedes's fingerprints appeared on at least one Treasury check seized from the vehicle.

At an evidentiary hearing on August 29, 2018 regarding both motions, I heard testimony from Agents Soares, Cronin, and

---

[5] Meanwhile, the Government's case against Mr. Castillo-Lopez continued before Chief Judge Saris. *See United States* v. *Castillo-Lopez*, Criminal Action No. 12-10261-PBS. Mr. Castillo-Lopez was indicted on August 28, 2012. On April 30, 2013, Mr. Castillo-Lopez pled guilty to one count of Conversion of Government Property, in violation of 18 U.S.C. § 641, and to one count of Money Laundering, in violation of 18 U.S.C. § 1956. On June 12, 2013, Mr. Castillo-Lopez was sentenced to a term of imprisonment of one year and one day and ordered to pay $34,800 in restitution.

Mitchell with respect to the motion to suppress, and from Sergeant John Costa of the MSP and Dr. Alicia Wilcox from Husson University with respect to the *Daubert* motion.  Ruling from the bench that day, I denied the *Daubert* motion, and directed supplemental briefing with respect to the motion to suppress.

On September 11, 2018, I held the final pretrial conference, during which I ruled from the bench with respect to the motion to suppress.  As relevant to this Memorandum, I declined to suppress the underlying fingerprint evidence, but did suppress statements made by Mr. Cruz-Mercedes to Agent Cronin beyond his initial self-identification as Pedro Colon.

The following day, Mr. Cruz-Mercedes, with assent from the Government, requested that he be permitted to enter a conditional plea of guilty, reserving his right to challenge my determinations regarding the fingerprint evidence.  On September 13, 2018, I accepted the conditional guilty plea.

By Judgment dated January 9, 2019, I sentenced Mr. Cruz-Mercedes to a term of imprisonment of 36 months and one day, followed by three years of supervised release with standard and special conditions.  I also required restitution in the amount of $34,8000, and a mandatory special assessment of $2,200.  At the same time, I signed a judicial order of removal based on the stipulation of the parties that would require Mr. Cruz-Mercedes be deported after his release from Bureau of Prisons custody.

On January 15, 2019, Mr. Cruz-Mercedes timely filed his notice of appeal.

## II. THE MOTION TO SUPPRESS

Mr. Cruz-Mercedes's motion [Dkt. No. 57] to suppress was directed at all evidence seized as a result of his June 7, 2012 arrest.  He argued that his arrest that day, when effectuated, was unsupported by probable cause and therefore violated the Fourth Amendment.  Consequently, he contended the fruits of his arrest — including specifically the envelope containing Treasury checks with any fingerprint alleged to be his on those checks — should be suppressed.

I address this contention in its larger context.

### A.  *Evidence Found in the Vehicle*

In his motion to suppress, Mr. Cruz-Mercedes argued that the impoundment, and subsequent search, of the vehicle without a warrant and without probable cause violated the Fourth Amendment, and that the fruits of that search – including an envelope containing ten fraudulently obtained Treasury checks totaling $75,808.14, a hand-written list written on the envelope with the names, Social Security Numbers, and monetary amounts of the checks, a personal check from payee Ana Cruz, and a deposit slip from a Bank of America account  – should be suppressed.[6]

---

[6] Because the latent fingerprint at issue was taken from the documents found in the vehicle, if the evidence seized from the

As a preliminary matter, I was not persuaded that Mr. Cruz-Mercedes had standing to object to the impoundment and search of the vehicle. *See infra* Section II.A.1. Even if he did have standing, I concluded on the merits, *see infra* Sections II.A.2. and B., that the evidence seized from the vehicle was obtained lawfully because the vehicle search falls within the scope of one or more of several enumerated exceptions to the probable cause and warrant requirements of the Fourth Amendment.

    1.   <u>Standing</u>

In order to have standing to challenge the admission of evidence seized from the vehicle, Mr. Cruz-Mercedes must be able to demonstrate that he has "a constitutionally protected reasonable expectation of privacy" in the vehicle's contents such that a search of the vehicle would be "presumptively unreasonable in the absence of a search warrant." *Katz* v. *United States*, 389 U.S. 347, 360-61 (1967); *see also United States* v. *Salvucci*, 446 U.S. 83, 92 (1980); *Rakas* v. *Illinois*, 439 U.S. 128, 143 (1979). Unlike other constitutional protections, "Fourth Amendment rights are personal rights, which . . . may not be vicariously asserted." *Rakas*, 439 U.S. at

---

vehicle is suppressed as the fruits of an unlawful search, it follows that the fingerprint found on the documents and, by extension, the comparison of that fingerprint to the known fingerprints taken from Mr. Cruz-Mercedes at the time of his arrest, must also be suppressed. *See generally Wong Sun* v. *United States*, 371 U.S. 471 (1963).

123-24 (internal citations and quotations omitted).  "[S]ince
the exclusionary rule is an attempt to effectuate the guarantees
of the Fourth Amendment, . . . it is proper to permit only
defendants whose Fourth Amendment rights have been violated to
benefit from the rule's protection."  *Id*. at 124 (internal
citation omitted).

Even assuming the search of the vehicle was unlawful, then,
Mr. Cruz-Mercedes could object to the introduction of the
evidence found in the vehicle only if he was personally
aggrieved by the search - that is, if he could demonstrate that
he had an objectively reasonable expectation of privacy in the
vehicle that was invaded.  *See Katz*, 389 U.S. at 361 (Harlan,
J., concurring).  I conclude he cannot.

Though "a passenger is seized, just as the driver is," when
a vehicle is stopped by law enforcement, his presence in the
vehicle does not automatically give him standing to object to a
subsequent search of the vehicle.  *United States* v. *Symonevich*,
688 F.3d 12, 19 (1st Cir. 2012) (citing *Arizona* v. *Johnson*, 555
U.S. 323, 332 (2009)).  Under First Circuit precedent,
"passengers in an automobile who assert no property or
possessory interest in a vehicle cannot be said to have the
requisite expectation of privacy in the vehicle to permit them
to maintain that the *search* did not meet Fourth Amendment
standards."  *United States* v. *Campbell*, 741 F.3d 251, 263 (1st

14

Cir. 2013) (citing *Symonevich*, 688 F.3d at 19) (emphasis added).

To be sure, Mr. Cruz-Mercedes asserts that he borrowed the car from his girlfriend and, consequently, his expectation of privacy was more reasonable than that asserted by a mere passenger.  He does, in some sense, have a possessory interest in the vehicle that may give rise to a reasonable expectation of privacy in its contents.  *See e.g.*, *United States* v. *Sugar*, 322 F. Supp. 2d 85, 94 (D. Mass. 2004) ("Generally speaking, persons who borrow cars have standing to challenge searches of the borrowed vehicles." (citing, *inter alia*, *United States* v. *Baker*, 221 F.3d 438, 442-43 (3d Cir. 2000))).  In such circumstances, I must consider various factors that are relevant to determining whether Mr. Cruz-Mercedes has standing to challenge the search, including "ownership, possession, and/or control; historical use of the property searched; . . . ability to regulate access; [and] the totality of the surrounding circumstances." *United States* v. *Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991) (citing *United States* v. *Aguirre*, 839 F.2d 854, 856-57 (1st Cir. 1988)).

Here, Mr. Cruz-Mercedes did not own the vehicle and does not assert any kind of cognizable property interest in it.  The vehicle was owned by Alma Martinez, and Mr. Cruz-Mercedes contends only that he "had been lent the car" by his girlfriend, Ms. Martinez's sister.  There is no evidence of record that Mr. Cruz-Mercedes had previously borrowed the vehicle or had any

15

ability to control access to the vehicle.  Nor is there any record evidence that Ms. Martinez, the record owner of the vehicle, allowed Mr. Cruz-Mercedes to borrow the vehicle: his testimony reflects only that her sister allowed him to use it. More fundamentally, Mr. Cruz-Mercedes was not the driver; he was merely along for the ride.

Consequently, I cannot say that Mr. Cruz-Mercedes had a reasonable expectation of privacy in the vehicle and therefore, that he can object to the introduction of the fruits of that search.

### 2.   The Merits

Even if Mr. Cruz-Mercedes could demonstrate that he does, in fact, have standing to object to the vehicle search, I have independently concluded the search itself was lawful.

The parties do not dispute the facts surrounding the search itself.  After Mr. Cruz-Mercedes and Mr. Castillo-Lopez[7] were taken into custody, law enforcement agents conducted a cursory search of the vehicle, and then impounded it.  Several hours later, Agents Soares and Mitchell searched the vehicle at the O'Neill Federal Building; the evidence seized from the vehicle was discovered during this second search.  The agents never

---

[7] Mr. Cruz-Mercedes does not argue that HSI lacked probable cause to arrest Mr. Castillo-Lopez, nor on this record could he successfully do so.  For the purpose of this motion, I have treated that arrest as lawful.

obtained a warrant to impound or search the vehicle, though the Government argues it had probable cause to believe the Treasury checks were in the vehicle based on Mr. Castillo-Lopez's previous conduct.

In any event, in the absence of a warrant, the seizure and subsequent search of the vehicle was lawful only if it fell within one of the established exceptions to the warrant requirements of the Fourth Amendment. I find that it satisfies two of these exceptions — that for automobiles generally[8] and that for inventory searches — and will address each in turn.

---

[8] The Government also separately argued that the search of the vehicle was justified because it was incident to the lawful arrest of Mr. Castillo-Lopez. Courts have long acknowledged that "a search incident to a lawful arrest is a traditional exception to the warrant requirement," and that law enforcement officers may search the person of a defendant when the defendant is arrested. *United States* v. *Robinson*, 414 U.S. 218, 224 (1973). The rule extends to allow a search of the area around the arrestee from which he could immediately access a weapon or destroy evidence. *Id.* at 224-25 (citing *Chimel* v. *California*, 395 U.S. 572, 768 (1969), *abrogated on other grounds by Davis* v. *United States*, 564 U.S. 229 (2011)).

The traditional scope of a search incident to arrest does not itself allow law enforcement to search a vehicle "after the arrestee has been secured and cannot access the interior of the vehicle." *Arizona* v. *Gant*, 556 U.S. 332, 335 (2009) (citing *New York* v. *Belton*, 453 U.S. 454 (1981)). However, the Supreme Court has also acknowledged that "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Gant*, 556 U.S. at 335.

Consequently, the "search incident to arrest" exception as presented here maps on the general automobile exception and I have directed my analysis to the automobile exception as such.

*a.   The Automobile Exception*

The Supreme Court has long held that "a warrantless search of an automobile, based upon probable cause to believe that the vehicle contained evidence of crime in light of an exigency arising out of the likely disappearance of the vehicle, did not contravene the Warrant Clause of the Fourth Amendment." *California* v. *Acevedo*, 500 U.S. 565, 569 (1991); *see also Chambers* v. *Maroney*, 399 U.S. 42, 48 (1970) (citing *Carroll* v. *United States*, 267 U.S. 132, 153-54 (1925)) ("[A]utomobiles and other conveyances may be searched without a warrant in circumstances that would not justify the search of a house or an office, provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize.").

The Supreme Court has also held that there is an "exigency" in the context of automobile detention that arises because of the automobile's inherently mobile nature, *Carroll*, 267 U.S. at 154, and that people have a "lesser expectation of privacy" in automobiles because of their use "as a readily mobile vehicle." *California* v. *Carney*, 471 U.S. 386, 391 (1985). Therefore, the potential mobility of an automobile - even without a demonstration that it is, in fact, imminently mobile at the time of the seizure - is sufficient for law enforcement officers to seize it without a warrant. *Id*.

To justify a warrantless search of an automobile, law enforcement officers need to demonstrate probable cause that the vehicle contained evidence of a crime when it was seized, even if the search itself takes place after the car has been impounded. *Acevedo*, 500 U.S. at 570 (citing *Chambers*, 399 U.S. at 51-52).

Mr. Cruz-Mercedes does not argue that HSI lacked probable cause to arrest Mr. Castillo-Lopez, or that the agents lacked probable cause to believe that the vehicle in question contained the Treasury checks or other evidence of Mr. Castillo-Lopez's crime. Furthermore, the record supports a finding that the HSI agents had probable cause to believe that the Treasury checks were in the vehicle. The evidence fully establishes that Mr. Castillo-Lopez was instructed to deliver the Treasury checks to the CI at the June 7, 2012 meeting and that Mr. Castillo-Lopez had previously brought fraudulently-obtained Treasury checks to meetings with the CI. Agent Soares also testified that Mr. Castillo-Lopez did not have the Treasury checks on his person when he was arrested.

Because HSI had probable cause to believe the Treasury checks were in the vehicle at the time Mr. Castillo-Lopez was arrested and the vehicle was seized, the subsequent warrantless search of the vehicle was proper.

Consequently, the fruits of that search were admissible on

the basis of the automobile exception.

      *b.   Community Caretaking and Inventory Searches*

Even if HSI lacked probable cause to search the vehicle when Mr. Castillo-Lopez was arrested, the seizure, and subsequent search of the vehicle, were proper under the exception established for community caretaking and for inventory searches.

The community caretaking exception to the warrant requirement "encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." *United States* v. *Coccia*, 446 F.3d 233, 238 (1st Cir. 2006) (internal citation omitted); *see also South Dakota* v. *Opperman*, 428 U.S. 364, 368 (1976).  This exception empowers law enforcement officers to impound automobiles "so long as the impoundment decision was reasonable under the circumstances." *Id*. at 239.  In this context, reasonableness requires law enforcement to have "a non-investigatory reason for seizing an [individual's] car." *Vega-Encarnacion* v. *Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003).  When the driver of the vehicle is arrested "and there is no one *immediately* on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car."  *Id*. (emphasis in original).

The vehicle here was impounded following the arrest of Mr. Castillo-Lopez, the driver.  Even if Mr. Cruz-Mercedes' arrest

was unlawful, it is undisputed that he could not take possession of the vehicle and that there was no one else immediately available to do so.  Moreover, Agent Soares testified that HSI agents who were present at the scene of the arrest believed the vehicle was not in "a safe location" when they impounded the vehicle.  The impoundment therefore fell squarely within the community caretaking exception to both the warrant and probable cause requirement.

Once the vehicle had been impounded, HSI Agents were entitled to do a full inventory search of the vehicle even without a warrant and probable cause, so long as the search was done in accordance with reasonable procedures.  *See Opperman*, 428 U.S. at 368, 372; *Colorado* v. *Bertine*, 479 U.S. 367, 372 (1987).  Here, there is no indication that Agents Soares and Mitchell did not follow standard procedure when searching the vehicle once it had been brought to the O'Neill Federal Building.  Nor is there any indication that the search was unreasonable or undertaken in bad faith.

Consequently, the search of the vehicle qualified as a lawful inventory search conducted after the vehicle had, justifiably, been impounded.  The fruits of that search were

therefore admissible.[9]

## B.  *The Fingerprints and Cell Phones*

Mr. Cruz-Mercedes also focused his objections on the introduction of the cellphones seized from his person following his arrest on June 7, 2012, and to the introduction of the fingerprints obtained as a result of that arrest.

There is no question that, if Mr. Cruz-Mercedes was lawfully on arrested on June 7, 2012, both pieces of evidence would be admissible as the fruits of a lawful search incident to arrest.  *See United States* v. *Robinson*, 414 U.S. 218, 224 (1973).  The admissibility of both pieces of evidence, then, rested on the question whether HSI and Secret Service Agents had probable cause to arrest Mr. Cruz-Mercedes, *see United States* v. *Watson*, 423 U.S. 411, 418 (1976), which, in turn, rested on when such an arrest could properly be effectuated.

### 1.  The June 7, 2012 Arrest

Broadly speaking, the protections of the Fourth Amendment extend beyond traditional "arrests" and cover all "seizures of the person," including those which "do not eventuate in a trip to the stationhouse and prosecution for crime."  *Terry* v. *Ohio*, 392 U.S. 1, 16 (1968).  "[W]henever a police officer accosts an

---

[9] The fruits include the fingerprint pulled from the Treasury checks found in the vehicle and compared to the prints provided by Mr. Cruz-Mercedes after his arrest on June 7, 2012.

individual and restrains his freedom to walk away, he has

'seized' that person" and the seizure must be justified either

by probable cause or by an exception to the probable cause

requirement. *Id.; see also California* v. *Hodari D*, 499 U.S.

621, 626 (1991).

This does not mean, however, that every interaction between

an individual and law enforcement constitutes a seizure; law

enforcement officers do not need individualized suspicion to

approach an individual and ask a few questions, "[s]o long as a

reasonable person would feel free to disregard the police and go

about his business." *Florida* v. *Bostick*, 501 U.S. 429, 434

(1991) (citing *Hodari D*, 499 U.S. at 628) (cited by *United*

*States* v. *Drayton*, 526 U.S. 194, 201 (2002)).

Nor does it mean that every police encounter that would

cause a reasonable person not to feel free to go about his

business constitutes an arrest that requires probable cause and

triggers the requirements of *Miranda* v. *Arizona*, 384 U.S. 436

(1966).[10]   Instead, law enforcement officers may "stop and

---

[10] By its terms, *Miranda* v. *Arizona* applies to "custodial
interrogations."  384 U.S. 436, 444 (1966).  However, the
Supreme Court has interpreted the term "custody" to apply to
contexts in which "a suspect's freedom of action is curtailed to
a degree associated with formal arrest."  *Berkemer* v. *McCarthy*,
468 U.S. 420, 430 (1984) *see also Oregon* v. *Mathiason*, 429 U.S.
492, 495 (1977) (per curiam); *Beckwith* v. *United States*, 425
U.S. 341, 347 (1976).  The First Circuit has specifically held
that a *Terry* stop, though a seizure, does not trigger the

briefly detain an individual for investigative purposes if
police have a reasonable suspicion that criminal activity is
afoot." *United States* v. *Dapolito*, 713 F.3d 141, 147-48 (1st
Cir. 2013).[11]   To be sure, a *Terry* stop can, without more, mature
into a custodial arrest if the suspect is detained for an
extended period of time, *see United States* v. *Sharpe*, 470 U.S.
675, 686 (1985); if the suspect is transported away from the
scene of the original stop, *see Dunaway* v. *New York*, 442 U.S.
200, 211-12 (1979); or, if the stop was solely for the purpose
of searching the suspect to obtain evidence, like fingerprints.
*See Davis* v. *Mississippi*, 394 U.S. 721, 727 (1969).   To be
lawful, any custodial arrest, as distinct from a *Terry* stop,
must be supported by probable cause based on information
obtained *before* the seizure resulted in a formal arrest.[12]

---

requirements of *Miranda*.   *United States* v. *Campbell*, 741 F.3d
251, 265 (1st Cir. 2013).

[11] As with "probable cause," the phrase "reasonable suspicion"
"[is] a commonsense, nontechnical conception that deals with the
factual and practical considerations of everyday life." *Ornelas*
v. *United States*, 517 U.S. 690, 695 (1996) (internal quotations
omitted); *see also United States* v. *Dapolito*, 713 F.3d 141,
147-48 (1st Cir. 2013).   "Reasonable suspicion requires there be
both a particularized and objective basis for suspecting the
individual stopped of criminal activity," even if that basis
does not rise to the level of probable cause. *Dapolito*, 713
F.3d at 148.

[12] *See Smith* v. *Ohio*, 494 U.S. 538, 543 (1990) (per curiam)
("[I]t is axiomatic that an incident search may not precede an
arrest and serve as part of its justification." . . . [the
exception for search incident to arrest] does not permit the
police to search any citizen without a warrant or probable cause
so long as an arrest immediately follows."); *United States* v.

There are three interactions between Mr. Cruz-Mercedes and the agents of HSI that could constitute a seizure triggering this kind of analysis – Agent Riley's initial conversation with Mr. Cruz-Mercedes in the McDonald's; Mr. Cruz-Mercedes being escorted out of the McDonald's with Mr. Castillo-Lopez; and, Mr. Cruz-Mercedes' conversation with Agent Cronin in the parking lot prior to his formal administrative arrest.  It is clear from the record that the law enforcement officers present did not have probable cause to suspect Mr. Cruz-Mercedes of *any* crime until he identified himself to Agent Cronin as Mr. Cruz-Mercedes and confessed he was in the country illegally.[13]  The Government does not contest that the cellphones and Mr. Cruz-Mercedes' fingerprints were, in fact, fruits of that arrest,[14] though it advances arguments relating to inevitable discovery in the alternative.

Since the Government sought only to introduce evidence based on the third interaction — Agent Cronin's encounter with Mr. Cruz-Mercedes in the parking lot — I will focus my attention

---

*Bizier*, 111 F.3d 214, 217 (1st Cir. 1997) ("[E]vidence recovered after an arrest may not form the basis of probable cause for that arrest." (citing, *inter alia*, *Smith*, 494 U.S. at 543)).

[13] The Government concedes as much and instead argues that Mr. Cruz-Mercedes was not "arrested" for the purposes of this analysis until after his conversation with Agent Cronin, when he was formally put under administrative arrest.

[14] As a result, if the arrest is unlawful, the cellphones and the fingerprints must be suppressed.  *See generally Wong Sun*, 371 U.S. 471.

on that encounter without detailed discussion of the prior two
interactions between Mr. Cruz-Mercedes and law enforcement on
June 7, 2012.  I have concluded that Mr. Cruz-Mercedes was in
custody by the time he was questioned in the parking lot by
Agent Cronin.[15]  During the conversation, Mr. Cruz-Mercedes
initially identified himself as "Pedro Colon" and handed over
several identification documents, including a Massachusetts
driver's license, listing his name as such.  After Agent Cronin
expressed skepticism that the documents were, in fact, his, Mr.
Cruz-Mercedes confessed that he was not telling the truth about
his identity and that he was in the United States unlawfully.

As a preliminary matter, because Mr. Cruz-Mercedes was in
custody, he was entitled to receive the *Miranda* warnings before
being questioned by law enforcement.  *Berkemer* v. *McCarthy*, 468

---

[15] From the record, it is clear to me that the interaction
between Mr. Cruz-Mercedes and Agent Riley inside the McDonald's
was, at most, a *Terry* stop because there is no indication that
Agent Riley did anything more than ask Mr. Cruz-Mercedes a few
questions.  However, even if he was not handcuffed inside the
McDonalds, the interaction between Mr. Cruz-Mercedes and law
enforcement had ripened into an arrest by the time he was
removed from the McDonalds.  *See, e.g.*, *Dunaway* v. *New York*, 442
U.S. 200, 211-12 (1979); *Florida* v. *Royer*, 460 U.S. 491, 504
(1983).  At that time, the agents did not have probable cause to
believe that Mr. Cruz-Mercedes was involved in criminal
activity.  *Illinois* v. *Wardlow*, 528 U.S. 119, 124 (2000) ("An
individual's presence in an area of expected criminal activity,
standing alone, is not enough to support a reasonable,
particularized suspicion that the person is committing a
crime."); *see also United States* v. *Di Re*, 332 U.S. 581, 593
(1948).

26

U.S. 420, 430 (1984) (*Miranda* applies to "custodial interrogations," and, in this context, "custody" applies to any circumstance in which "a suspect's freedom of action is curtailed to a degree associated with formal arrest.").  In other words, Agent Cronin could not question Mr. Cruz-Mercedes in a manner that was "reasonably likely to elicit an incriminating response" without first advising him of his rights and obtaining a valid waiver of those rights.  *Rhode Island* v. *Innis*, 446 U.S. 291, 300 (1980).

This does not mean, however, that Agent Cronin could not ask Mr. Cruz-Mercedes anything.  The Supreme Court has recognized an exception to its rule in *Miranda* for "booking" questions – that is, "questions to secure the biographical data necessary to complete booking or pretrial services" that are "requested for record-keeping purposes only."  *Pennsylvania* v. *Muniz*, 496 U.S. 582, 601 (1990); *see also United States* v. *Sanchez*, 817 F.3d 38, 45 (1st Cir. 2016).  However, the exception does not extend so far as to allow law enforcement to elicit incriminating information "in the guise of asking for background information."  *Sanchez*, 817 F.3d at 45.

Here, though Mr. Cruz-Mercedes was entitled to receive his *Miranda* warnings before speaking further with law enforcement officers, Agent Cronin was equally entitled to ask for basic biographical information and for identification.  Consequently,

Mr. Cruz-Mercedes' initial self-identification as "Pedro Colon," and the identification documents he provided were admissible under the booking exception to *Miranda*.

However, his subsequent statements about his true identity and his unlawful presence in the United States were not, especially because Mr. Cruz-Mercedes never received the *Miranda* warnings during his conversation with Agent Cronin.[16]  I found that Agent Cronin's comments were "reasonably likely to elicit an incriminating response from the suspect," even if they did not constitute express questioning about criminal activity or Mr. Cruz-Mercedes' presence in the country.  *Innis*, 446 U.S. at 300 (1980).  They therefore fell outside the booking exception to *Miranda*.  *Sanchez*, 817 F.3d at 45.  Consequently, any statements Mr. Cruz-Mercedes made to Agent Cronin beyond identifying himself as "Pedro Colon" and handing over documents confirming that identity must be suppressed.  They also cannot form the basis for probable cause to legitimize Mr. Cruz-Mercedes' previous custodial arrest.

### 2.   Inevitable Discovery

Because they constituted the fruits of an unlawful arrest, Mr. Curz-Mercedes' fingerprints (and the cellphones seized from

---

[16] These statements also constituted the unlawful fruits on an illegal arrest and could be excluded even if Mr. Cruz-Mercedes had properly been read his rights before being questioned.  *See Taylor* v. *Alabama*, 457 U.S. 685, 691 (1982).

his person) must be suppressed unless they "would have been discovered even without the unconstitutional source."[17]  *Utah* v. *Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Nix* v. *Williams*, 467 U.S. 431, 443-44 (1984)).

Here, even excluding the incriminating statements made by Mr. Cruz-Mercedes to Agent Cronin, I am convinced that federal agents would still have found and properly arrested (and fingerprinted) Mr. Cruz-Mercedes, and would have had access to the records associated with one of the phones found on Mr. Cruz-Mercedes' person when he was searched incident to arrest, albeit not to the physical phones themselves.

   *a.   The Fingerprints*

As of June 7, 2012, the Government legally had access to both the cellphones seized from Mr. Castillo-Lopez as a result of his arrest, and to the evidence properly seized from the vehicle, including the fingerprints recovered from the Treasury checks.  *See supra*.  The Government also knew that Mr. Cruz-Mercedes identified himself as "Pedro Colon," and had been given access to his Social Security Number and Massachusetts Drivers'

---

[17] Two other broad exceptions to the exclusionary rule – for independent discovery and based on attenuation – do not apply here because the evidence was seized immediately after Mr. Cruz-Mercedes was arrested and because federal agents did not, in fact, subsequently discover either the fingerprints or the cellphone through lawful means.  *Utah* v. *Strieff*, 136 S. Ct. 2056, 2061 (2016).

license pursuant to the booking exception.  I find and conclude
that evidence seized from the vehicle would have led law
enforcement officers to Ana Cruz and Maria Martinez – the
holders of the bank account into which the CI was directed to
make cash deposits.

An investigation regarding the two women would have led to
Ms. Betty Sanchez, the Defendant's girlfriend, and ultimately to
Mr. Cruz-Mercedes.  Once they had the name "Hector Cruz-
Mercedes," law enforcement officers likely would have run a
search on public databases to find information about Mr. Cruz-
Mercedes.  Upon conducting a standard database search regarding
Mr. Cruz-Mercedes, the agents would readily have observed that
the Mr. Cruz-Mercedes found during the search was the same
individual who was detained on June 7, 2012 and who identified
himself as Pedro Colon.  This would have given agents probable
cause to arrest Mr. Cruz-Mercedes for fraudulent use of a social
security number and would, ultimately, have allowed law
enforcement to obtain his fingerprints lawfully.[18]

---

[18] As the record now stands, law enforcement officers unlawfully
obtained Mr. Cruz-Mercedes' known fingerprints when he was
arrested and processed by HSI for his unlawful presence in the
country on June 7, 2012.  The Defendant has not contended that
obtaining his known fingerprints as a consequence of a later —
lawful — arrest would have yielded some different fingerprint
formation.

The process would involve basic and predictable shoe leather police work.  Indeed, this was the kind of basic police work that federal agents engaged in throughout their investigation of Mr. Castillo-Lopez and that was ongoing both when Mr. Cruz-Mercedes was initially arrested in June 2012 and subsequently.  *See United States* v. *Silvestri*, 787 F.2d 736, 744 (1st Cir. 1986) ("[T]here are three basic concerns which surface in an inevitable discovery analysis: are the legal means truly independent; are both the use of the legal means and the discovery by that means truly independent; and does the application of the inevitable discovery exception . . . provide an incentive for police misconduct . . . ?").

I am satisfied that, by using evidence not subject to suppression, law enforcement would not only inevitably have found Mr. Cruz-Mercedes, but also would have had a properly grounded basis for probable cause to arrest him and obtain his fingerprints even without his unlawful arrest on June 7, 2012. The fact that agents, in fact, recovered this evidence through unlawful means does not bar the application of the inevitable discovery rule here.  *Silvestri*, 787 F.2d at 745.

Consequently, I was prepared to allow his fingerprints into evidence.

     *b.   The Phone Records*

Even adopting the inevitable discovery analysis above, I am

not persuaded that law enforcement officers inevitably would
have had access to the two cell phones seized from Mr. Cruz-
Mercedes' person on June 7, 2012.  There is no non-speculative
basis for finding he would have had those same phones on his
person when he was inevitably arrested by federal agents at a
later date.

Nevertheless, I am satisfied that federal agents would
inevitably have had access to the records independently
associated with the phone number (347)-245-2491 ("the 347
number").  HSI found the 347 number during a lawful search of
the cellphone seized from Mr. Castillo-Lopez as a result of his
arrest.  Mr. Castillo-Lopez's phone had received numerous text
messages from that number relating to his criminal enterprise,
and Ms. Sanchez, during an interview with law enforcement,
identified the 347 number as belonging to Mr. Cruz-Mercedes.
From there, federal agents could, and did, issue a Grand Jury
subpoena to the service provider, who identified the phone as a
Blackberry Curve with a specific ID number, who could provide
law enforcement with phone records even if the physical
Blackberry device had not previously been seized.[19]

---

[19] Here, of course, because HSI agents had previously seized the
Blackberry devices, they sought and obtained a search warrant to
unlock the phone and access the data stored on it, rather than
getting the records from the cellphone provider.  This shortcut,
however, does not make the inevitable discovery doctrine
inapplicable, especially because the search warrant was obtained

Through this altogether predictable, and indeed inevitable path, agents would have discovered the phone records of the Blackberry Curve devices associated with Mr. Cruz-Mercedes, even if they would not have had access to the two phones as physical items themselves.  Consequently, I declined to suppress evidence of the phone records associated with the Blackberry Curve devices.

### III. THE *DAUBERT* MOTION

Mr. Cruz-Mercedes moved, [Dkt. No. 60], to exclude the expert testimony of Sgt. John Costa, of the Massachusetts State Police, on the basis that Sgt. Costa did not follow accepted scientific methodology when comparing Mr. Cruz-Mercedes' known fingerprints, taken at the time of his arrest, to the print lifted from Treasury checks found in the vehicle.  In support of his motion, Mr. Cruz-Mercedes offered evidence from his own expert, Dr. Alicia Wilcox, who testified that Sgt. Costa did not properly follow accepted scientific methodology when comparing the prints, and that, in her opinion, the prints found on the

---

as part of an ongoing investigation into Mr. Castillo-Lopez. There is no indication, then, that allowing the phone records to be used at trial would "either provide an incentive for police misconduct or significantly weaken fourth amendment protection" in any way.  *United States* v. *Silvestri*, 787 F.2d 736, 744 (1st Cir. 1986); *see also, e.g.*, *United States* v. *Almeida*, 434 F.3d 23, 28 (1st Cir. 2006).

Treasury checks were not clear enough to be accurately compared to the prints taken from Mr. Cruz-Mercedes.

The Federal Rules of Evidence allow a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise" if the following criteria are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help a trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Rule 702 requires the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 578, 589 (1993).  In making a reliability determination, I must consider "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue."  *Id*. at 592-93. To this end, the Supreme Court has identified a variety of factors I may consider, including "whether [the methodology] can be (and has been) tested," "whether the theory or technique has been subject to peer review and publication," whether there is a

34

known rate of error, and whether the methodology is generally accepted by the scientific community.  *Id*. at 593-94.

These *Daubert* factors are "meant to be helpful, not definitive," and the lists referenced by the Supreme Court in case law are not exhaustive.  *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 151 (1999).  Instead, the Supreme Court has made clear that "a district court [has] the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 142 (emphasis in original).  The ultimate goal of any *Daubert* inquiry "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.  As long as the expert's testimony meets this threshold of reliability, it should be presented to a jury and "tested by the adversary process – [by] competing expert testimony and active cross-examination."  *United States* v. *Vargas*, 471 F.3d 255, 265 (1st Cir. 2006) (citing *Ruiz-Troche* v. *Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

The parties here do not contest that the two experts – Sgt. Costa for the Government and Dr. Wilcox for the Defendant – have the requisite skills, experience, and training to qualify as experts; nor do they contest that the question whether the two

sets of fingerprints – the ones pulled from the Treasury checks ("the latent prints")[20] and the ones taken from Mr. Cruz-Mercedes at the time of his initial arrest ("the known prints") – match is relevant here and that testimony of Sgt. Costa and Dr. Wilcox will be helpful to the jury.  Mr. Cruz-Mercedes also does not argue that the Analysis, Comparison, Evaluation, and Verification ("ACE-V") methodology that Sgt. Costa used is per se unreliable; indeed, courts across the country have found that "most of the *Daubert* factors support admitting latent fingerprint identification evidence obtained pursuant to the ACE-V method."  *See United States* v. *Pena*, 586 F.3d 105, 110-11 (1st Cir. 2009) (citing various cases that have found expert testimony on fingerprint identification based on this methodology sufficiently reliable under *Daubert*); *see also Vargas*, 471 F.3d at 264-65.

Mr. Cruz-Mercedes instead argues specifically that Sgt. Costa did not properly analyze the latent fingerprints, as a consequence of which the conclusions he drew were unreliable. To determine whether Sgt. Costa's testimony may be presented to a jury, I conducted an evidentiary hearing on August 29, 2018

---

[20] During the hearing, Sgt. Costa testified that he identified eight fingerprints from the evidence seized from the vehicle but that only one of the prints was clear enough to be compared to the known fingerprints of Mr. Cruz-Mercedes, taken when he was arrested on June 7, 2012.

during which both experts explained the process of comparing fingerprints using the ACE-V method.

For his part, Sgt. Costa also testified about the procedure he followed in analyzing the fingerprints at issue here.  He testified that the latent prints were difficult, but that there were enough details in one of the latent prints to make a positive comparison to any known print.  He testified that he analyzed the latent print alongside the known print, and that at least some of his notes analyzing the latent print were made after he determined that the latent print matched the known print.  He also testified that he did not follow the standards for documentation set by the Scientific Working Group on Friction Ridge Analysis Study and Technology ("SWGFAST"), but that he did go through all four stages of the ACE-V methodology and documented his procedures according to MSP protocol.

Dr. Wilcox, in turn, testified that she believed that none of the latent prints were suitable for comparison because none were sufficiently clear to allow for a positive identification. She also testified that Sgt. Costa's failure to document his thought-process during the analysis stage of his comparison rendered the comparison unreliable because it opened the door to unconscious bias and made it impossible for a third party to evaluate his methodology.

Based on the testimony presented during the evidentiary hearing, I could not find that Sgt. Costa's methodology was so unreliable that it should be kept from the jury. To be sure, Dr. Wilcox's testimony highlighted the importance of documentation to the scientific process, and I did not accept the Government's suggestion that documentation is irrelevant to a determination of reliability. The documentation here was not full and complete, and that affects the credibility of Sgt. Costa's conclusion, even if he properly used the ACE-V procedures.

While the SWGFAST standards for documentation represent the consensus view on what is appropriate, I was not convinced that Stg. Costa's failure to follow them renders his conclusions so unreliable that his opinion must be kept from the jury entirely. While that failure certainly raised concerns about confirmation bias and opens Stg. Costa's conclusions to robust challenge on cross-examination, the question whether to accept his comparison as accurate is properly left for the jury.

Consequently, I denied the *Daubert* motion.

## IV. CONCLUSION

For the foregoing reasons:

(A) The motion [Dkt. No. 57] to suppress, was GRANTED with respect to all statements made by Mr. Cruz-Mercedes to Agent Cronin identifying himself as Hector Cruz-Mercedes, and with

38

respect to the physical cell phones found on his person; the motion to suppress was DENIED with respect to fingerprints, phone records, and other papers seized as a result of the lawful arrest of Mr. Castillo-Lopez, including the search of the vehicle he was driving, and

(B) The motion [Dkt. No. 60] to exclude the testimony at trial of the Government's fingerprint expert was DENIED.


*/s/ Douglas P. Woodlock_____*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE